UNITED STATES v. RAINE-ANDREWS LUMBER CO.

(District Court, N. D. West Virginia. January 3, 1920.)

No. 19.

1. COURTS ⬡347—ANSWER TO BILL CONSTRUED TO SET UP FRAUD AND MISTAKE, SO THAT EVIDENCE OF COMMUNICATIONS AND NEGOTIATIONS PRIOR TO EXECUTION OF CONTRACT WAS ADMISSIBLE.

Answer to bill by the United States to enjoin defendant, who had contracted in writing to sell cut-over land for a forest reserve, from removing timber, in which defendant set up that it was understood the right to remove virgin timber was reserved, *held* sufficient to raise the issue of fraud and mistake under the new equity rules, and so parol evidence of the communications prior to the execution of the agreement was admissible.

2. EVIDENCE ⬡428—PAROL ADMISSIBLE WHERE CONTRACT THROUGH FRAUD OR MISTAKE DOES NOT SHOW REAL AGREEMENT.

Where a written contract, through fraud or mistake, does not express the intention of the parties, parol evidence is admissible to show the real agreement.

3. UNITED STATES ⬡5—POLICY OF GOVERNMENT NOT TO WRONG CITIZENS.

It is the policy of the United States never knowingly to do wrong and injustice to any of its citizens.

4. WOODS AND FORESTS ⬡8—CONTRACT NOT RESERVING LANDOWNER'S RIGHT TO REMOVE VIRGIN TIMBER RESULT OF MISTAKE.

In a suit by the United States to enjoin a landowner, who sold a large quantity of cut-over lands for a forest reserve, from removing about 100 acres of virgin timber, *held* that, under the evidence, the failure of the consummated contract and deed to reserve to the landowner the right of removal was the result of mistake, due to representations of the officials of the forestry department, so evidence of communications between the parties prior to the contract, etc., was admissible.

5. EVIDENCE ⬡441(1)—PAROL EVIDENCE ADMISSIBLE TO SHOW SEPARATE AND INDEPENDENT CONTEMPORANEOUS CONTRACT.

In a suit by the United States to enjoin defendant, who had contracted to sell cut-over lands for a forest reserve, *held*, that there was an independent contemporaneous contract, whereby defendant was to be entitled to cut a small amount of virgin timber still on the lands to be sold, so evidence of communications between the parties prior to the contract was admissible.

6. WOODS AND FORESTS ⬡8—VENDOR OF CUT-OVER LANDS HAVING RIGHT TO REMOVE VIRGIN TIMBER FROM FOREST RESERVE.

Where the government's forester, who handled the negotiations for cut-over lands for a forest reserve, declined to agree to defendant's reservation, for two years, of the right to remove the virgin timber on about 100 acres of a large tract, which was agreed to be sold, but stated that the matter should be handled by permits for a reasonable time after the government acquired title, defendant's failure to remove the timber within two years after the contract was made did not deprive it of its

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

right of removal thereafter, the government not having acquired title for some time, and the permits not having been issued, for the agreement by the forester was an independent contemporaneous contract.

In Equity. Suit by the United States against the Raine-Andrews Lumber Company. On final hearing of application for injunction. Temporary restraining order dissolved, and bill dismissed.

On the 10th day of October, 1919, the United States presented its bill against the defendant, wherein it charges that on or about the ——— day of ———, 1919, it instituted against it in this court proceedings to condemn 5,614.92 acres of land under the Weeks Forestry Act, and that such proceedings are pending and undetermined; that the United States purchased this tract under contract with defendant dated October 5, 1915 (a mistake—should be October 5, 1914), a copy of which contract is exhibited; that under this agreement it purchased the land in fee, subject to reservation of coal and mining rights and easement for nine years for a railroad to be maintained by defendant to remove the timber from other lands owned by it; that plaintiff has caused the lines and corners to be marked as set out on plat filed; that "since the order of the said court appointing viewers" the defendant company, at points set forth in the bill as identified by the plat, has gone on said tract of land and cut at least 200,000 feet of valuable timber, and is threatening to cut at least a million and a half of other timber within a radius of not to exceed a mile and a half from the point where it is now cutting, which timber it is converting to its own use, against the plaintiff's rights. Further allegations as to such cutting, the alleged willful and unlawful character thereof, and the necessity for injunction are made. The prayer of the bill is for immediate injunction and decree for threefold damages in value for all timber so removed.

The day after the filing of this bill, without notice to defendant, a temporary restraining order for ten days was granted, notice was required to be given, and the motion for temporary injunction was set down for hearing at Wheeling on October 21st following. On that date the defendant appeared and by agreement of parties the restraining order was continued in force until November 13th, at Philippi. By subsequent agreement it was continued, from time to time, until December 8, 1919, at Martinsburg, when and where the evidence was taken and full hearing of the cause had, and the court took time to consider of its judgment in regard thereto.

In the meantime, however, on November 15th, the defendant filed its answer, in which it admits the allegations of the bill that condemnation proceedings have been instituted and are pending; that the contract under date of October 5, 1914, was executed; that since viewers in the condemnation proceedings were appointed it has cut 241,070 feet, and removed to its mill 128,305 feet, of timber from the land. It asserts its right for such action, and for the right to further cut and remove some million and a half other timber therefrom, for substantially the reasons that it was never contemplated by the parties that the uncut-over timber on the land should be sold by it, but only the surface of the land was so sold, and by independent agreement such timber and the right to cut and remove it was to be reserved to it.

Upon the hearing, the evidence was almost wholly documentary in character, the material parts of which are herein set forth, and from which the rights of parties must be determined. On August 12, 1913, the Forest Service of the Department of Agriculture procured from the defendant a proposal to sell to the United States 32 parcels of land (24 in Randolph and 8 in Tucker counties, this state) aggregating about 13,200 acres.

This proposal, made upon the government's printed blank form, set forth: "When timber is cut off, we will remove all the buildings, machinery, etc., which right we reserve in the proposal, except, if sale is made, we will let any three houses that you may select remain on the ground. We will reserve all timber for a period of ten years, with privilege of extension if we are compelled to shut down for strikes, fires, or something beyond our control." Also this: "If the timber rights on whole acres are reserved for 10 years and the

mineral rights are reserved on whole acres, we will sell for $4 per acre." And this: "Said land is free and clear from incumbrances, excepting about 400 acres, title to which is now pending in the Supreme Court."

On August 22, 1913, the department's Forest Examiner in charge wrote a letter to defendant, in which, after acknowledging receipt of this proposal to sell, he says:

"It is the policy of the National Forest Reservation Commission not to accept lands on which the timber cannot be removed within two or three years, except at a very low price, on account of the fact that purchase by the government relieves the owners of taxes, cost of protection, and a large share of the carrying cost of the investment. Therefore I think it unlikely that your offer can receive favorable consideration unless you would be willing to consider a lower price than $4 per acre. The mineral reservation would be satisfactory, but it would be necessary to fix definitely the minimum diameter limits to which you will cut."

To this letter defendant, under date of August 25th, after acknowledging its receipt, replied:

"Would advise that the costs you refer to would only be a small item. In this state timber and land are assessed separately and we are assessed $2 an acre for cut over lands. You have timber in this section which you are protecting, and this additional amount should not add materially to the cost of protection, especially with our co-operation."

On September 12th following the Forest Examiner wrote to the government's local supervisor at Elkins a letter in which he says:

"The two objectionable features of the proposal of the Raine-Andrews Lumber Company were that, while they had 7,000 acres of cut-over land and only 5,000 acres of merchantable forest yet remaining, they desired a cutting period of ten years, with the privilege of further extension in case they were compelled to shut down. A ten-year period is too long for a tract of 5,000 acres. I believe that a thousand acres a year should be about the minimum allowance. Moreover, it was evident, from the wording of the proposal, in which it was stated that 'the timber rights are reserved on the whole number of acres,' that the company expected to recut the 7,000 acres of cut-over land. This would mean that the government might carry this 7,000 acres for a period of nine years, and that the vendors during the tenth year would have the right to cut all the merchantable timber on this area at that time. If this land could be offered, releasing the 7,000 acres of cut-over land immediately, and cutting the 5,000 acres to a diameter of at least 12 inches for oak and poplar (if it is hardwood land), the proposal would merit consideration at the price of $4 at which it is offered. I hope you can take the tract up with the owners again on this basis, and see if it is possible to obtain a modified proposal."

On September 25th following the local examiner or supervisor replied to this letter as follows:

"I have had an opportunity on September 23d to talk over with Mr. T. W. Raine, of the Raine-Andrews Lumber Company, their offer of 13,200 acres of land, 8,200 of which has already been cut over and the remainder, 5,000 acres, is still in virgin forest. The company does not wish to recut the 7,000 from which the merchantable timber has been removed, and in case of sale to the government this acreage, together with 1,200 acres of burned brush land could be delivered at once. I dare say the wording of the proposal was a little misleading, when 'the timber rights are reserved on the whole number of acres.' Mr. Raine meant that the timber rights were reserved on the whole number of acres (5,000) still to be cut over.

"As far as shortening the period of cut, they cannot do it with the mill of the capacity now in operation. The mill has a capacity of about 15,000,000 board feet per year. The company has just finished the cut on a 1,000-acre tract which yielded 35,000,000 feet, and it took nearly 2½ years to complete this cut. From this you can see that, to remove the timber from at least 1,000 acres per year, the company would require a mill of double the capacity of the one now in operation. The timber on the 5,000 acres will average about 25,000 to 30,000 board feet per acre. For the amount of material to be removed a ten-year limit is quite reasonable.

"I took up the question of a diameter limit, but the company could not be expected to adhere to a diameter on the 5,000 acres, which is composed of spruce, hemlock, birch, maple, beech, basswood, ash, cherry, and cucumber, Timber, averaging 25,000 board feet per acre in the spruce and hemlock type, is usually all large trees that can be cut, excepting an occasional beech and some small spruce, and these are cut to a 4-inch limit.

"I accompanied Mr. C. D. Cushing in making a preliminary examination of the tract. We did not have an opportunity to examine the best of the cut-over lands, nor the heaviest stands and best soil in the virgin portion of the tract. Mr. Cushing placed a value of $4 per acre on the land from just what he had seen. Portions within this 13,200 acres could be sold readily for $10 per acre.

"At my request Mr. Raine will make out another proposal, stating clearly just what reservations he will make and including their share in co-operation with the government in fire patrol."

On October 8th following the inspector in charge at Washington wrote to the local one at Elkins as follows:

"Your letter of September 25th is received. In order that we may better consider the proposal in this case when it is resubmitted, please let us know the condition of the land that has already been cut over. We cannot give much weight to the forest fire protection in which this company will co-operate, since this will be largely for their own benefit in the protection of their own timber. I do not believe, however, that the proposal will be considered at a price of $4, unless the company is willing either to reserve occasional seed trees of ash, cherry, and basswood, which are the most valuable species of the hardwood land, or to agree to cut those species to some diameter limit where this is possible. What proportion of this land would you say was occupied by spruce and hemlock, and what proportion by hardwoods? The soil of the spruce type is generally extremely gravelly, rocky, or sandy, and has invariably been given a much lower value than the hardwood lands. In the White Mountains the usual value for the spruce type has been about $1 an acre. If the company could be induced to reduce their offer to $3 an acre, there would be a much greater probability of its being favorably considered."

To this the local examiner on October 17th replied:

"The hardwood lands of this company, consisting of approximately 6,000 acres have already been cut over. The company is now operating in the spruce and hemlock type, which contains a small proportion of birch, beech, maple, cucumber, ash, cherry, and basswood, along with the heavy stand of spruce and hemlock. This type will average upwards of 30,000 board feet per acre. In the hardwood portion of the tract fires have occurred nearly every spring and fall, and there are about 2,000 acres burned over. On the whole, the hardwood lands are in good condition, and are restocking rapidly to a young growth. Several boundaries of the hardwood land have been sold from the original tract, after being cut over, at the rate of $10 per acre, to be used for agricultural purposes. Local owners of adjacent lands place a value of more than $4 per acre on the entire tract after the timber is removed. The mixture of hardwoods in the spruce and hemlock type increases the soil value, and in this tract it is worth double in value of the soil in the pure spruce stands. I believe $2 per acre is the lowest value placed on any lands in Randolph county, although some lands deserve a much lower value.

"Mr. Raine has not resubmitted the proposal. It is hardly probable that the company could be induced to offer their lands at $3 per acre."

And again on November 10th he wrote:

"The Raine-Andrews Lumber Company have resubmitted their proposal for the sale of their lands to the government. In this proposal they have included only the lands that have been cut over, amounting to 6,482 acres, and reserve the timber rights on 100 acres for two years. The land is offered at a rate of $4 per acre, which is a reasonable price for this class of land. I expect that other portions of their holdings in this section may be acquired as fast as they are cut over. The proposal, with a map showing the lands offered is inclosed."

The second proposal inclosed with map reduced the negotiations to the cut-over lands aggregating 6,482 acres, and is likewise made upon the govern-

ment's form therefor. It is dated November 5, 1913. It describes the lands by reference to the survey map and contains the following:

"At the red letter 'A' inclosed by dotted lines is a tract of 400 acres in dispute, case pending in the Supreme Court of this state. At black letter 'B' are about 100 acres of uncut timber that we want to reserve for two years; also a right of way along the Glady Fork, from Evenwood to Gladwin, will be reserved until we finish cutting our timber in this section, which will be about eight years."

It also contains the following:

"If the timber rights on 100 acres are reserved for two years, and the mineral rights are reserved on 6,482 acres, will sell for $4 per acre."

On November 12, 1913, the Forest Inspector in charge at Washington thereupon wrote the defendant as follows:

"Your proposal of November 5th, in which you offer 6,482 acres of land largely cut over, situated in Randolph county, W. Va., to the government under the Weeks Law at $4 an acre, is received.

"An examination will be made of this land at the earliest convenience of Mr. W. A. Hopson, Elkins, W. Va., the representative of the Forest Service on the Monongahela area, and you will be advised whether the tract can be recommended for purchase to the National Forest Reservation Commission at $4 an acre."

On the same date he wrote the local examiner at Elkins as follows:

"The offer of the Raine-Andrews Lumber Company of their 6,482-acre tract at $4 an acre seems to be at a reasonable price. The map which they submit, however, shows that their railroad runs about 18 miles through the very center of this tract. For this reason I imagine that the problem of fire protection would be very difficult to handle in connection with its administration. If the railroad is incorporated, it will have to conform to the state laws in regard to equipment of locomotives and in clearing up the right of way to reduce the danger from forest fires. If it is not incorporated, I think it will be desirable to have some understanding with them in regard to what measures they will take in order to reduce the danger from fire along the railroad. This point I believe should be taken up with Mr. Wm. L. Hall, when he makes his trip to the Monongahela area to see if it is possible to reach some understanding with the lumber company in regard to what preventive measures they will assume."

Correspondence, not necessary to quote here, between the local examiner and the defendant, indicates that the former's examination and report to the department required something like seven months' time. On June 17, 1914, the examiner in charge at Washington sent to the local one both a telegram and letter. The letter contains the following:

"I wired you to take an option on this 6,400 acres contained in the last proposal of the Raine-Andrews Lumber Company at $4 an acre, and to let us have a summary of the report showing the valuation of the tract and the map as soon as possible. The complete report can be sent in later. It is desirable, however, that we get a summary of it, in order to be able to decide several days before the Commission meets upon the desirability of bringing the tract before the Commission. If we can secure the complete report by June 20th, this will give us several days for copying it for the meeting.

"While it was understood, in submitting their proposal, that the minerals would be reserved, if you can do so, we would like for you to limit the period of mineral reservation to 20 years, with the understanding that, in case commercial deposits are not located for development within that time, the mineral rights shall lapse. This, however, is not necessary, but it is desirable."

The local examiner replied on June 18th as follows:

"Your telegram of June 17th is received. Mr. T. W. Raine, of the Raine-Andrews Lumber Co., is now in Pennsylvania, and will pass through Elkins on Saturday on his way to Evenwood. Mr. Presyz, his manager, has confirmed the option at $4 per acre. The map and report will be forwarded on June 19th."

On June 20, 1914, he wrote a letter to T. W. Raine, and sent copy thereof to the Assistant Forester at Washington, in which he says:

"I am inclosing an option prepared in duplicate to cover the 6,000 acres of land in Randolph and Tucker counties, West Virginia, belonging to the Raine-Andrews Lumber Company, at the price of $4 per acre, with the minerals reserved to the vendor for a period of 20 years. Please have the proper officers of the company execute the original copy of the option before a notary public in the presence of witnesses and return it in the inclosed envelope. The duplicate copy is for the files of the company.

"In returning the option, will you please send a certified copy of the minutes of the meeting of the directors of the company, showing the authority of the officers to sign the option, or a copy of the by-laws of the company covering this point,"

On June 22, 1914, Raine, in a letter to the local examiner at Elkins, set forth a list of the different kinds of timber and amounts, in 1,000 feet board measure, cut from the lands offered for sale to the government, showing an aggregate of 76,775,000 feet so cut. This statement concludes thus:

"There is still 800,000 feet on these lands of saw timber which would make about 77½ million feet."

T. W. Raine answered the local examiner's letter of the 20th on the 23d, as follows:

"I have sent option to Mr. Andrews, our president, to sign, and will send it to you as soon as it returns. There is no reservation in it for right of way for the railroad. This will have to be reserved, and revert to the government after we are through here."

On June 24, 1914, Assistant Forester Hall wrote T. W. Raine as follows:

"The National Forest Reservation Commission at its meeting to-day approved for purchase under the Weeks Law the 6,000 acres of land belonging to the Raine-Andrews Lumber Company, in Randolph and Tucker counties, West Virginia, at $4 an acre. The government desires to purchase this land, and a purchase agreement will therefore be prepared and sent you for signature within a few days."

And on July 7th he wrote him:

"We have not received the option covering the 6,000 acres of land of the Raine-Andrews Lumber Company which you wired us on June 23d was on the way. We are awaiting this option in order to prepare the purchase agreement for the tract and will be glad to have you submit it as soon as possible.

"In the proposal which is dated November 5, 1913, you mention your desire to reserve for two years the timber on 100 acres, together with a railroad right of way for the time which would be required to remove your timber in that section. I have been informed since that you are cutting the timber on the 100 acres, and if this is so you will probably have completed its removal before the title to the tract can pass to the government in which case there is no need to mention a reservation of the timber.

"As to the right of way, I should be glad to know whether it would be satisfactory to you to retain your railroad right of way under a form of a free annual permit granted by the government. In this way it would not be necessary for you to retain an easement for it, and I am sure the retention of the right of way under annual permit would be quite as satisfactory to yourselves."

And on July 8th:

"The option given the Secretary of Agriculture on the 6,000 acres of land, more or less, belonging to the Raine-Andrews Lumber Company in Randolph and Tucker counties, West Virginia, is received.

"I am inclosing a voucher to cover payment for the option. Please sign the voucher at the point indicated and return it in the inclosed envelope, and a check will be sent you."

T. W. Raine, on July 11th, wrote the Assistant Forester as follows:

"Replying to yours of 7th in regard to purchase of 6,000 acres of Raine-Andrews lands, forwarded to me here. You no doubt have the option by this time, as I sent it to Mr. Hopson at Elkins the 6th. The delay was caused by having to send it to New Bethlehem, Pa., to have our president sign it, and have seal attached. As to the timber, will remove all of it the coming winter. As to the right of way for railroad, an annual permit from the government

would be satisfactory, if it was arranged to be given every year until our timber is exhausted, which, at full capacity, will take seven years. Another year will be required to ship out the timber, and take up the rails."

And on July 16th the Assistant Forester wrote Raine:

"Your letter of July 11th from Avonia, Pa., is received. We shall draw up the contract for your land without reference to the reservation of the timber or the railroad, and when title passes to the land a permit will be issued to you, covering the right of way, which permit can be renewed from year to year until the right of way is no longer needed by your company or its successors. Inasmuch as the timber will all be removed before title is likely to pass to the government, no mention will be made in the agreement concerning the timber reservation."

And on the same day he sent to the Solicitor for the Department of Agriculture the following memorandum:

"The National Forest Reservation Commission at its meeting on June 24th approved for purchase a tract of 6,000 acres of land, more or less, in Randolph and Tucker counties, West Virginia, belonging to the Raine-Andrews Lumber Company, at the price of $4 per acre, with the minerals reserved. Please prepare an agreement to cover the purchase of this land. The option held by the government is inclosed for your information. Maps showing the boundaries of the tracts are also inclosed herewith.

"In preparing the agreement, please omit reference to the right of way and the reservation of the timber on 100 acres cited in the option, as these matters will be handled under permits. In connection with the reservation of the minerals, the agreement should provide for a bond in the sum of $3,000. A copy of the by-laws of the Raine-Andrews Lumber Company, showing the authority of the officers to sign the agreement, is also inclosed."

And on August 8th he wrote the defendant company as follows:

"Reference is made to my letter of June 24, 1914. I am inclosing for execution the agreement in quadruplicate to cover the purchase of the 6,000 acres of land in Tucker and Randolph counties, West Virginia, belonging to the Raine-Andrews Lumber Company, at the price of $4 per acre.

"Please have the proper officers of the company sign all four copies of the agreement before a notary public, having their signatures witnessed, and return them in the inclosed envelope. One copy of the agreement will be sent you for the information of the vendor, after it has been approved by the Secretary of Agriculture.

"In returning the agreements, please inclose a certified copy of the resolution of the board of directors, giving the officers of the company authority to execute it, or a certified copy of the by-laws of the company covering this point."

On August 24th T. W. Raine replied as follows:

"On my return home today I found your letter of the 8th inst., with agreement inclosed to be executed by our company to cover the purchase of the 6,000 acres of land in Tucker and Randolph Co. This agreement is all right, with the exceptions of article 1. In our reservation mentioned, you have omitted the reservation for railroad right of way to stand until we finished cutting our other timber lands. I received a letter from you stating that this could be arranged by yearly permits. This would be satisfactory, but some mention should be made of it in this article 1.

"As soon as this is arranged by you, I will have the agreement properly executed and forwarded to you at once."

And on September 24th the Assistant Forester replied:

"Your letter of August 24th is received. The Raine-Andrews tract was approved by the National Forest Reservation Commission without reservations except as to the minerals. However, the Secretary of Agriculture has been granted some latitude in matters of detail such as this, and if you will add at the end of paragraph 1 in all copies of the agreement a reservation covering the easement for the railroad right of way along Glady fork I will recommend that the Secretary of Agriculture approve the agreement. I suggest the following wording:

"Also reserving to the vendor, its successors and assigns, for a period of eight years from the date of this instrument, an easement for the right of way of the logging railroad through the property along Glady Fork."

This is substantially the correspondence between the parties preceding the contract of sale, which bears date October 5, 1914. This agreement, a true copy of which is filed with defendant's answer, it will be noted, was prepared by the government's solicitor, and does not contain any reservation of the timber uncut. It provides that the vendor company should furnish abstract of title, a safe conveyance of the property, with right to the government to institute condemnation proceedings, if not satisfied as to such title. Subsequent correspondence may be properly added as follows:

October 7, 1914, the Acting Assistant Forester sent to the Department Solicitor the following memorandum:

"I am returning herewith for the approval of the Secretary of Agriculture the agreement, in quadruplicate, covering the purchase of the 6,000 acres of land, more or less, in Randolph and Tucker counties, West Virginia, belonging to the Raine-Andrews Lumber Company. The agreement has been signed by the vendors. The addition to page 2 of the agreement, regarding the easement for the railroad right of way, is acceptable to the Forest Service, if stated in the proper form."

On same date he wrote to F. L. Andrews as follows:

"The agreement to cover the purchase of the 6,000 acres of land in Randolph and Tucker counties, West Virginia, belonging to the Raine-Andrews Lumber Company, has been received. The addition to page 2 of the agreement, regarding the easement of the railroad right of way, is acceptable to the Forest Service. A copy of the agreement will be sent you for the information of the company, after it has been approved by the Secretary of Agriculture."

And on October 16, 1914, to T. W. Raine this:

"I am inclosing by registered mail an executed copy of the agreement covering the purchase of 6,000 acres of land in Randolph and Tucker counties, West Virginia, from the Raine-Andrews Lumber Company, under the provisions of the Weeks Law. This copy of the agreement is to be retained for the information of the vendor."

On January 27, 1915, the local Forest Examiner in charge made to the department this report:

"Report on Trespass.

"Monongahela Trespass                                    Elkins, W. Va.,
"Timber                                                  January 27, 1915.
"The Raine-Andrews Lumber Co.

"1. The Raine-Andrews Lumber Company, of Evenwood, W. Va., lumber operators. Reputation good. Financial standing good. The company is responsible for the trespass.

"2. (a) (1) The trespass began on October 28, 1914. It terminated December 23, 1914. The trespass was continuous. Dates were determined from the company and from J. E. Hilleary, the contractor, cutting and skidding the timber. (2) The trespass occurred on lands under contract for purchase from the Raine-Andrews Lumber Co. The trespass area covers about 30 acres and lies south of Woodford run on the west side of Glady fork, nearly adjacent to the Glady and Alpena railroad, and about six miles north of Evenwood. (See map submitted with this report.) (3) Trespass occurred by resuming operations through a previous logging contract that J. E. Hilleary made with the company three years ago, to log the timber lying to the west of Glady fork and south of Woodford run.

"Under this contract, Mr. Hilleary has removed all of the timber called for in the contract excepting approximately 175,000 board feet, of hardwoods. During the summer of 1914, after this tract was approved for purchase, which was June 30, 1914, Mr. T. W. Raine, treasurer and general manager of the Raine-Andrews Lumber Company, spoke to Mr. Hilleary about picking up the logs he had skidded from the tract, but were not in reach of the company's log loader, and asked him to clean up the job. Mr. Raine did not mean that he should continue cutting any more timber, but that all the logs and a few cords of bark should be placed closer to the railroad. At the time that the

trespass began Mr. Raine was attending to business in Pennsylvania, and the men left in charge approved the further cutting of timber by Mr. Hilleary. On his return from Pennsylvania, Mr. Raine called at this office, on December 21st and acknowledged that the timber cut by Hilleary was not included within the 100 acres of timber asked to be reserved in the proposal submitted November 5, 1913. In the sale contract, there is no mention made of the reservation of this timber, for it was understood that the timber on the 100 acres would be removed before the final title was passed.

"The amount of timber cut in trespass is as follows:

| | |
|---|---:|
| Ash | 2,000 |
| Cherry | 1,000 |
| Maple | 84,000 |
| Chestnut | 10,000 |
| Birch, beech and others | 33,585 |
| Total | 130,585 |

"The timber was of good quality and estimated to be worth $3.50 per thousand on the stump, and at the railroad $9.50 per thousand, for the contractor received $6 per thousand for cutting and skidding. The logs were the only material removed. The logs have all been removed to Evenwood and sawed in the mill. The men engaged in removing the timber were John E. Hilleary, Alpena, W. Va., French Stalnaker, Rich Mountain, W. Va.; Luther Kerns, Wymer, W. Va.; Ike Smith, Wymer, W. Va.; Brancon Summerfield, Bowden, W. Va.

"3. Trespass was not connected with any authorized use of the National Forests. The company formerly owned these lands, but overlooked reserving the timber on this portion, when the lands were offered for sale to the government. The facts in this case show that the trespass was committed unintentionally on the part of the contractor. The area upon which the trespass occurred was examined by Forest Guard Joseph Schmidlen, Alpena, W. Va., on December 4, 9, 26, 1914.

"5. (a) (1) The trespass should be settled on an innocent basis, for the reason that the contractor, J. E. Hilleary, was not notified that he should not continue cutting on his former contract; also Mr. Raine had not instructed his assistants in the exact location of the timber he wished to reserve. Mr. Raine stated that he did not know that Hilleary was cutting timber until his return from Pennsylvania. In settlement for the timber and tie trespasses (see report on tie trespass), Mr. Raine offers to exchange about 35 acres of timber, uncut, lying to the north of lot 14, and to the west of a boundary of land owned by Nathaniel Carr, and on lands under contract for sale to the government. (See map.) This 35 acres of timber is part of the 100 acres of timber Mr. Raine reserved in the proposal of November 5, 1913. The other portion of the 100 acres of timber is at the head of Ash lick and Five lick runs and is now being removed. The 35 acres of timber offered in exchange contains, according to Mr. Raine, 200,000 board feet of hardwoods, consisting of red oak, basswood, chestnut, and others, and is worth about $5 per thousand on the stump. In order to determine the amount and value of this timber, it will be necessary to make an estimate of the same. The timber trespass amounts to $407.05, with the timber valued at $3.50 per thousand on the stump, while the tie trespass amounts to $100.56, with the ties valued at 12 cents per tie, making a total of $507.61 required in settlement of the two trespasses. It is recommended that the exchange of timber on the 35 acres of uncut timber be accepted, provided the stand is found sufficient in quantity and value to make up for the timber and ties removed in trespass. By accepting this timber in exchange the company will be relieved of the reserved timber and will have no further cause to cut timber in the future on lands sold to the government. The company should be allowed six months in which to lop the tops and larger limbs.

"W. A. Hopson, Forest Examiner in Charge."

On March 25, 1915, the Assistant Forester wrote defendant as follows:

"Reference is made to the interview of December 21st of Mr. T. W. Raine, of the Raine-Andrews Lumber Company, with Mr. W. A. Hopson, the represen-

tative of the Forest Service, representing two timber trespasses by the Raine-Andrews Lumber Company on land now under purchase contract with the United States, the contract having been signed by the Secretary of Agriculture, October 10, 1914.

"Mr. Hopson's reports on these trespasses show that they took place between June 30, 1914, and December 23, 1914, and involved cutting at a point east of Glady fork and about three-fourths of a mile south of Gladwin and on the west slope of Middle Mountain, of 838 ties, having a stumpage value of $100.56, and the cutting at a point south of Woodford run of 130,585 feet B. M. of hardwood timber, having a total value of $407.05, giving an aggregate value of the timber cut in both trespasses of $507.61.

"Mr. Hopson has recommended that there be accepted in settlement of the amount involved in these trespasses certain timber reserved by the Raine-Andrews Lumber Company in their sale to the government amounting to 190,384 feet B. M. This timber is situated on an area of about 50 acres in lots 22 and 23, Randolph county, near the Myleus lands, and is located approximately as shown on the inclosed plot within the dotted lines and marked virgin timber. Since these trespasses were committed through inadvertence, it would seem an equitable method of settlement if this timber were transferred by the Raine-Andrews Lumber Company to the government conformably to Mr. Hopson's recommendation. Please inform me if this method of adjustment will suit the company."

To which on April 13th following T. W. Raine replied:

"Replying to yours of March 25th in regard to Mr. Hopson's report of trespasses and Mr. Raine's proposition of leaving standing timber: In lieu of this trespass, beg to say that we do not consider there has been any trespass, excepting as to the 838 ties, being a stumpage basis of 12 cents, and would enter our protest to this stumpage as being excessive. If you will refer to your letter of January 7, 1914, to our Mr. Raine, which we interpret as meaning that we are privileged to cut 100 acres of timber on these lands, to be taken off during the winter of 1914–1915. Unless there had been an exact location of this 100 acres, we do not consider that there is any trespass, unless we had cut in excess of 100 acres; but in order to appease Mr. Hopson our Mr. Raine proposed to leave standing the virgin timber as indicated on the plat inclosed with your letter of March 25th, which accordingly we hereby confirm, and this matter of adjustment will suit us."

For reasons not disclosed, resort was not made to a direct conveyance by the defendant to the United States for the land, but condemnation proceedings were instituted in 1919, and are now pending as set forth in the bill.

S. W. Walker, U. S. Atty., and H. H. Byrer and C. W. Campbell, Asst. U. S. Attys., all of Martinsburg, W. Va., and J. P. Wenchal, Asst. Sol. Department of Agriculture, of Baltimore, Md., for the United States.

W. E. Baker, of Elkins, W. Va., for defendant.

DAYTON, District Judge (after stating the facts as above). [1] There are several propositions proven in this cause beyond all doubt or controversy. Among others: (a) That the government did not originally have any intent or purpose to buy the uncut virgin timber on this large tract of land; (b) that it did not, at any time, indicate any purpose to claim it prior to the agreement entered into October 5, 1914; (c) that this agreement was wholly prepared by its government solicitor under instructions from the forestry division having the preliminary negotiations in charge; (d) that this lumber company had no purpose or design of selling the timber on the uncut-over land, estimated to be worth to it, by reason of the merchantable timber stand-

ing thereon, $45 per acre, to the government at the very modest price of $4 per acre.

Since procuring this agreement to sell, the government has, however, upon somewhat technical grounds, claimed, and by this proceeding is now seeking to secure, this timber, which it did not in fact purchase. Its position substantially is that the agreement is not ambiguous in its terms; that they are ample to include and constitute a complete sale of this uncut timber as part of the land sold, and, in the words of Justice Clifford in Walden v. Skinner, 101 U. S. 577, at page 584, 25 L. Ed. 963:

"When an agreement is reduced to writing by the act and consent of the parties, the intent and meaning of the same must be sought in the instrument which they have chosen as the repository and evidence of their purpose, and not in extrinsic facts and allegations."

Under this rule of law the counsel for the government has filed exceptions to the answer of the defendant, so far as it attempts to defend, relying upon negotiations and communications had prior to the execution of the agreement by the parties. I announced at the trial my purpose to overrule these exceptions, and now confirm such purpose for two reasons: First, because I am constrained to think that the allegations of this answer, under the simplified pleading provided for by the new equity rules (198 Fed. xix, 115 C. C. A. xix), were sufficient to raise the issue of fraud and especially mistake in the execution of the contract; and, second, were also sufficient to base the plea that a separate, independent, and contemporaneous contract had been made between the parties touching this uncut timber.

[2] The power and duty of equity courts to relieve for reasons of fraud and mistake are very generally recognized, and citation of authorities in support therefor would ordinarily be unnecessary; but inasmuch as the courts have varied as to the strictness of the rules governing as to what mistakes will be relievable—some holding they must be mutual on the part of both parties to the agreement—I quote the rules so clearly and satisfactorily set forth by Justice Clifford in Walden v. Skinner, supra, which are binding on federal courts:

"Courts of equity afford relief in case of mistake of facts, and allow parol evidence to vary and reform written contracts and instruments, when the defect or error arises from accident or misconception, as properly forming an exception to the general rule which excludes parol testimony offered to vary or contradict written instruments. Where the mistake is admitted by the other party, relief, as all agree, will be granted, and if it be fully proved by other evidence, Judge Story says, the reasons for granting relief seem to be equally satisfactory. 1 Story, Eq. Jur. § 156.

"Decisions of undoubted authority hold that where an instrument is drawn and executed that professes or is intended to carry into execution an agreement, which is in writing or by parol, previously made between the parties, but which by mistake of the draftsman, either as to fact or law, does not fulfill or which violates the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement; the reason of the rule being that the execution of agreements fairly and legally made is one of the peculiar branches of equity jurisdiction, and if the instrument intended to execute the agreement be from any cause insufficient for that purpose, the agreement remains as much unexecuted as if the party had refused altogether to comply with his

engagement, and a court of equity will, in the exercise of its acknowledged jurisdiction, afford relief in the one case as well as in the other, by compelling the delinquent party to perform his undertaking according to the terms of it and the manifest intention of the parties. Hunt v. Rousmaniere's Adm'rs, 1 Pet. 1, 13, [7 L. Ed. 27]; Same v. Same, 8 Wheat. 174, 211 [5 L. Ed. 589].

"Even a judgment, when confessed, if the agreement was made under a clear mistake, will be set aside, if application be made, and the mistake shown, while the judgment is within the power of the court. Such an agreement, even when made a rule of court, will not be enforced, if made under a mistake, if seasonable application be made to set it aside, and, if the judgment be no longer in the power of the court, relief, says Mr. Chief Justice Marshall, may be obtained in a court of chancery. The Hiram, 1 Wheat. 440, 444 [4 L. Ed. 131].

"Equitable rules of the kind are applicable to sealed instruments as well as to ordinary written agreements; the rule being that if by mistake a deed be drawn plainly different from the agreement of the parties, a court of equity will grant relief by considering the deed as if it had conformed to the antecedent agreement. So if a deed be ambiguously expressed in such a manner that it is difficult to give it a construction, the agreement may be referred to as an aid in expounding such an ambiguity; but if the deed is so expressed that a reasonable construction may be given to it, and when so given it does not plainly appear to be at variance with the agreement, then the latter is not to be regarded in the construction of the former. Hogan v. Insurance Co., 1 Wash. [C. C.] 419, 422 [Fed. Cas. No. 6,582].

"Rules of decision in suits for specific performance are necessarily affected by considerations peculiar to the nature of the right sought to be enforced and the remedy employed to accomplish the object. Where no question of fraud or mistake is involved, the rule with respect to the admission of parol evidence to vary a written contract is the same in courts of equity as in those of common law, the rule in both being that, when an agreement is reduced to writing by the act and consent of the parties, the intent and meaning of the same must be sought in the instrument which they have chosen as the repository and evidence of their purpose, and not in extrinsic facts and allegations. Proof of fraud or mistake, however, may be admitted in equity to show that the terms of the instrument employed in the preparation of the same were varied or made different by addition or subtraction from what they were intended and believed to be when the same was executed.

"Evidence of fraud or mistake is seldom found in the instrument itself, from which it follows that unless parol evidence may be admitted for that purpose the aggrieved party would have as little hope of redress in a court of equity as in a court of law. Even at law, all that pertains to the execution of a written instrument or to the proof that the instrument was adopted or ratified by the parties as their act or contract, is necessarily left to extrinsic evidence, and witnesses may consequently be called for the purpose of impeaching the execution of a deed or other writing under seal, and showing that its sealing or delivery was procured by fraudulently substituting one instrument for another, or by any other species of fraud by which the complaining party was misled and induced to put his name to that which was substantially different from the actual agreement. Thoroughgood's Case, 4 Coke, 4.

"When the deed or other written instrument is duly executed and delivered, the courts of law hold that it contains the true agreement of the parties, and that the writing furnishes better evidence of the sense of the parties than any that can be supplied by parol; but courts of equity, says Chancellor Kent, have a broader jurisdiction and will open the written contract to let in an equity arising from facts perfectly distinct from the sense and construction of the instrument itself. Pursuant to that rule, he held it to be established that relief can be had against any deed or contract in writing founded on mistake or fraud, and that mistake may be shown by parol proof and the relief granted to the injured party whether he sets up the mistake affirmatively by bill or as a defense. Gillespie v. Moon, 2 Johns. (N. Y.) Ch. 585, 596 [7 Am. Dec. 559]."

[3-5] In its verified answer (the bill was verified and by it answer under oath was not waived) the defendant says:

"Respondent further states that it would never have signed said contract of sale at $4 per acre in fee without having therein a specific reservation of its right to cut and remove all merchantable timber from said tract, which said timber alone was worth at least $45 per acre, but for the letter of July 16, 1914, from Wm. L. Hall, Assistant Forester for the United States Department of Agriculture, hereinbefore set out, wherein he states: *"We shall draw up the contract for your land without reference to the reservation of the timber. * * * Inasmuch as the timber will all be removed before title is likely to pass to the government, no mention will be made in the agreement concerning the timber reservation."* But relying implicitly upon said letter protecting its timber rights, it caused said contract to be executed on October, 5, 1914.

"Respondent further states that, although said contract was executed on October 5, 1914, more than five years ago, the title thereto has never been approved or said land taken up by the plaintiff, by reason of which it has suffered the loss of more than 30 per cent. interest upon the purchase price, been compelled to pay taxes thereon for five years, and if it should be denied the right to remove the balance of the merchantable timber therefrom, it would suffer a great injustice, and much pecuniary loss, as the merchantable timber remaining uncut thereon is worth at least $5 per thousand feet on an average, as alleged in paragraph No. 9 of plaintiff's bill."

I am constrained to believe this statement to be strictly true. Its very statement of substantially undisputed fact as to the value of the timber involved is impressive, and it would be hard to conceive why such value would be surrendered by a company managed by men of business sense and capacity. In the first proposal to sell the full acreage of 13,200 acres owned by it, the company proposed to reserve the timber with a 10-year limit to cut and remove it. This was objected to by the government forester, who, assuming that 7,000 acres of the whole had been cut over, expressed his belief "that 1,000 acres a year should be about the minimum allowance" for cutting a remainder of 5,000 acres uncut. The capacity of defendant's mill was not equal to this, and the result was that, at the local examiner's request, Mr. Raine, for the defendant, undertook to submit a second proposal, and upon notice to this effect the government's forester at Washington wrote its local agent:

"I do not believe, however, that the proposal will be considered at a price of $4, unless the company is willing to reserve occasional seed trees of ash, cherry, and basswood"

—meaning, manifestly, refrain from cutting such. And he added:

"If the company could be induced to reduce their offer to $3 per acre, there would be a much greater probability of its being favorably considered."

In reply the local examiner stated the hardwood lands (that would supply seed trees of ash and cherry) had already been cut over, and that "several boundaries from the original tract, after being cut over, had been sold for agricultural purposes at the rate of $10 per acre." The second proposal confined the negotiation to the cut-over land substantially, but set out that timber on 100 acres thereof uncut was to be reserved for two years, and agreeing:

"If timber rights on 100 acres are reserved for two years, and the mineral rights are reserved in 6,482 acres, will sell for $4 per acre."

It will be thus seen that the company had gone in this paper to the limit—offered to limit the uncut area to a total area of 100 acres within the limits of the 6,482-acre boundary—and that this proposition had come to the final word, so far as the company was concerned, as regards the sale of the uncut timber; and it was so regarded by the government officials in charge of the negotiations, for we hear nothing further, during the seven months taken by them to make examination of the land, in regard to any further reductions in the timber reservations, and when the assistant forester had prepared the three months option dated June 27, 1914, he inserted in it the reservation for two years of the uncut timber on 100 acres. Had the forester seen fit to prepare the final agreement of sale in accord with this option which he himself prepared, or had prepared, and had inserted in it the option clause in regard to this timber reservation, there is no doubt the ruling of the Supreme Court of Appeals of this state in the cases of Null v. Elliott, 52 W. Va. 229, 43 S. E. 173, Adkins v. Huff, 58 W. Va. 645, 52 S. E. 773, 3 L. R. A. (N. S.) 649, 6 Ann. Cas. 246, Electro Co. v. Montgomery, 70 W. Va. 754, 74 S. E. 994, and Deer Creek Lumber Co. v. Sheets, 75 W. Va. 21, 83 S. E. 81, cited and so confidently relied on by counsel for the government, would have been decisive. The agreement to sell in that event would have restricted the removal of the timber to a specific and limited period of two years from the date of the agreement.

Several very vital deductions are to be drawn from these cases— among others: (a) That in order to forfeit the right of the owner to his timber the contract must fix a specific period of time within which the timber must be cut and removed, and this period of time must have elapsed. This for the reason that "such a provision as this in timber contracts is held to be a condition of the sale, and not a covenant to remove, and that the purchaser only takes such of the timber as he may cut and remove in the specified time; otherwise it remains the property of the landowner as part of the land." Null v. Elliott, supra. It is very clear from these cases that where, in the contract, no specified period of time for removal is set forth, this rule is wholly inapplicable. In such case there is a severance, whereby the seller remains the owner of the timber, and the buyer becomes owner of the land surface, as so commonly illustrated in this state, where coal is sold from under the land and the surface is retained.

Incidentally it may be noted that this Null Case was really decided independent of all these considerations, on the ground that equity had no jurisdiction; the plaintiff Null having, if any at all, a complete remedy at law. That ruling, if applied here, would dismiss and end the government's case. I do not apply it, however, and make no point as to it other than to mention it, for that, as I construe the subsequent case of Pardee v. Lumber Co., 70 W. Va. 68, 73 S. E. 82, 43 L. R. A. (N. S.) 262, it overrules this ruling in the Null Case, and I think rightly so. A second deduction from the Null and other cases, relied on as above set forth, is (b) that the right of equity to reform or rescind these timber contracts for fraud or mistake is fully recognized; and (c) in the Adkins-Huff Case, 58 W. Va. at page 649, 52 S. E. 773, 3 L. R. A.

(N. S.) 649, 6 Ann. Cas. 246, citing and approving Johnson v. Moore, 28 Mich. 3, the right of equity to uphold and enforce an independent simultaneous contract as to the timber reserved is also fully recognized.

But the forester did not see fit to include in the final agreement to sell the option's clause in regard to the timber reservation, but instead wrote the defendant, under date of July 7th, ten days after the option had been prepared (dated June 27th):

"In the proposal which is dated November 5, 1913, you mention your desire to reserve for two years the timber on 100 acres, together with a railroad right of way for the time which would be required to remove your timber in that section. I have been informed since that you are cutting the timber on the 100 acres, and if this is so you will probably have completed its removal before the title to the tract can pass to the government, in which case there is no need to mention a reservation of the timber."

This was a clear recognition of the defendant's right to the timber and its right to remove it, with no definite fixed date to do so. But this was not all; on July 18th he wrote defendant:

"We shall draw up the contract for your land without reference to the reservation of the timber or the railroad, and when title passes to the land a permit can be renewed from year to year until the right of way is no longer needed by your company or its successors. Inasmuch as the timber will all be removed before title is likely to pass to the government, no mention will be made in the agreement concerning the timber reservation."

Here was a clear recognition of the right of the defendant to cut and remove the timber until title should pass to the government, and an implied promise, if not so cut by that time, permit would be granted it to do so afterwards, as in the case of the use of the railroad across the land. And this implied promise is made certain by the fact that, on the very same day he wrote this letter to the defendant, he sent a memorandum of directions to the department's solicitor as to how the final agreement was to be drawn, in which he says:

"Please prepare an agreement to cover the purchase of this land. The option held by the government is inclosed for your information. Maps showing the boundaries of the tracts are also inclosed herewith. In preparing the agreement, please omit reference to the right of way and the reservation of the timber on 100 acres cited in the option, as these matters will be handled under permits."

When it is borne in mind that all these writings, the two proposals, the option, and the final agreement to sell, were prepared under the direction of the government's officers, and that the consummation of the purchase was only to pass when title deed was declared to be satisfactory to the government's Attorney General, it seems to me their terms should be construed more liberally in favor of the grantor defendant—in short, constitute an exception to the general rule to the contrary. And this is strengthened by the very general and very proper understanding that the government will never knowingly do wrong and injustice to any of its citizens. For reasons not disclosed, the Attorney General has never approved of the government's taking title direct from the defendant. For near five years or more it has delayed securing title by condemnation proceedings, only having instituted such proceedings a few months ago. During all this time—to be

accurate, since June 27, 1914, the date of its option—defendant's large tract of land has been tied up in a degree of uncertainty as to whether it would be taken by the government or not. It has been deprived of all right to sell and convey to others. It has lost the use in the way of interest on the very moderate price at which it agreed to sell, something over $8,500, and now is confronted with a demand that its purchase price be abated, or it be required to pay the government damages for the cutting of something over 240,000 feet of lumber at threefold its value, or over $3,600, which it believed, and had good reason to believe, it owned and had right to cut, and also be deprived of the value of at least 800,000 feet more of timber, worth $4,000, which it believes and insists it never sold, and the government agreed it should have the right to cut and remove.

I cannot reconcile myself to hold that the contentions of the government to this end would be in accord with equity and good conscience. On the contrary, I am constrained to reach the conclusion that the defendant by the final contract never intended to sell this timber on 100 acres of the uncut-over land; that its execution of this contract, so carrying on its face and by its terms such conveyance, was done by it by mistake at least, being directly led to do so by the representations of the government official agents having the negotiations in charge; that these representations in fact, taken together, as disclosed by the documentary evidence in the cause, fully constituted an independent, separate, and contemporaneous contract whereby the defendant was to have the right to this timber on 100 acres uncut over, and the right to cut and remove the same any time before the government took over the legal title, and a reasonable time thereafter by its permit. This conclusion is not shaken by the argument of counsel that, because the defendant in its option agreed to limit the time of removal to two years, and by the fact that Raine wrote they were going to cut the timber the following winter, that forfeiture of its right to such timber has thereby accrued in the government's favor.

[6] It could be argued very plausibly that the two-year limit clause in the option should relate to the two years following either the date of the option, the date of the final agreement, or the date when the government should finally take legal title to the land. But such argument becomes wholly de trop, because this clause of the option was not accepted by the government's forester; but, on the contrary, he constituted the limit, by his separate, independent, and contemporaneous contract, to be until the title to the land shall have passed to the government, and a reasonable time thereafter by permit, if necessary.

The bill admits that title has not yet passed to the government, but sets forth that condemnation proceedings to secure the same are pending.

It follows that the temporary restraining order must be dissolved, and the bill dismissed.